**Slip Op. 03-45**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

```
_____
                                    :
THE TIMKEN COMPANY,                 :
                                    :
        Plaintiff,                  :
                                    :
        v.                          :
                                    :
UNITED STATES,                      :
                                    :
        Defendant,                  :
                                    :   Court No.
        and                         :   00-08-00386
                                    :
NSK LTD. and NSK CORPORATION;       :
NTN BEARING CORPORATION OF          :
AMERICA, NTN BOWER CORPORATION,     :
AMERICAN NTN BEARING MANUFACTURING  :
CORPORATION and NTN CORPORATION;    :
KOYO SEIKO CO., LTD. and KOYO       :
CORPORATION OF U.S.A.               :
                                    :
        Defendant-Intervenors.      :
_____ :
```

Plaintiff, The Timken Company ("Timken"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of the United States International Trade Commission's ("ITC" or "Commission") final determination in <u>Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u>, 65 Fed. Reg. 39,925 (June 22, 2000), in which the ITC found that revocation of the antidumping finding (ITC Inv. No. AA-1921-143) and order (ITC Inv. No. 731-TA-343) on tapered roller bearings ("TRBs") from Japan "would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." Specifically, Timken contends, <u>inter alia</u>, that the ITC failed to: (1) incorporate the information and findings drawn by the ITC in its prior material injury determinations; (2) properly assess the importance of Japanese investment in the domestic industry; (3) consider the likely effect of revocation on the entire domestic industry; (4) adequately investigate the TRB capacity utilization rates of Japanese producers; (5) properly assess the likelihood of price underselling before revoking the order; (6) support its finding with respect to

the domestic industry's vulnerability or the likelihood of continued material injury upon revocation of the order; and (7) consider the relevant economic factors in the sunset review within the context of the business cycle. The complete views of the ITC were published in Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom ("Final Determination"), Invs. Nos. AA-1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, and 731-TA-399 (Review), USITC Pub. 3309 (June 2000).

**Held:** Timken's motion for judgment on the agency record is granted in part and denied in part. Case remanded to the ITC for further explanation and investigation consistent with this opinion.

[Timken's 56.2 motion is granted in part and denied in part. Case remanded.]

April 24, 2003

Stewart and Stewart (Terence P. Stewart, William A. Fennell and Amy S. Dwyer) for The Timkem Company, plaintiff.

Lyn M. Schlitt, General Counsel, Office of the General Counsel, United States International Trade Commission (Marc A. Bernstein and Mary Jane Alves), for the United States, defendant.

Crowell & Moring LLP (Robert A. Lipstein, Matthew P. Jaffe, Grace W. Lawson) for NSK Ltd. and NSK Corporation, defendant-intervenors.

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano and Wm. Randolph Rucker) for NTN Bearing Corporation of America, NTN Bower Corporation, American NTN Bearing Manufacturing Corporation and NTN Corporation, defendant-intervenors.

Sidley Austin Brown & Wood LLP (Neil R. Ellis and Maria T. DiGiulian) for Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., defendant-intervenors.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiff, The Timken Company ("Timken"), moves pursuant to USCIT R. 56.2 for judgment upon the

agency record challenging certain aspects of the United States International Trade Commission's ("ITC" or "Commission") final determination in Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 65 Fed. Reg. 39,925 (June 22, 2000), in which the ITC found that revocation of the antidumping finding (ITC Inv. No. AA-1921-143) and order (ITC Inv. No. 731-TA-343) on tapered roller bearings ("TRBs") from Japan "would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." Specifically, Timken contends, inter alia, that the ITC failed to: (1) incorporate the information and findings drawn by the ITC in its prior material injury determinations; (2) properly assess the importance of Japanese investment in the domestic industry; (3) consider the likely effect of revocation on the entire domestic industry; (4) adequately investigate the TRBs capacity utilization rates of Japanese producers; (5) properly assess the likelihood of price underselling before revoking the order; (6) support its finding with respect to the domestic industry's vulnerability or the likelihood of continued material injury upon revocation of the order; and (7) consider the relevant economic factors in the sunset review within the context of the business cycle. The complete views of the ITC were published in Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden,

and the United Kingdom ("<u>Final Determination</u>"), Invs. Nos. AA-1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, and 731-TA-399 (Review), USITC Pub. 3309 (June 2000).[1]

### Background

On January 23, 1975, the ITC determined that a domestic industry was likely to be injured as a result of Japanese TRBs imported into the United States that were likely to be sold at less than fair value ("LTFV"). See <u>Tapered Roller Bearings and Certain Components Thereof From Japan</u>, Inv. No. AA-1921-143, USITC Pub. 714 at 2 (Jan. 1975). A dumping finding was published in the Federal Register, <u>see</u> 41 Fed. Reg. 34,975 (Aug. 18, 1976), and on August 10, 1981, the United States Department of Commerce ("Commerce") specified that the order was to be limited to TRBs, four inches or less in outside diameter and components thereof, and excluded unfinished components. <u>See</u> <u>Clarification of Scope of Antidumping Finding of Tapered Roller Bearings and Certain Components Thereof From Japan</u>, 46 Fed. Reg. 40,550 (Aug. 10, 1981). The ITC made a further material injury determination with respect to TRBs not

---

[1]     During the issuance of this determination, the Commission was comprised of Chairman Koplan, Vice Chairman Okun and Commissioners Bragg, Miller, Hillman and Askey. Vice Chairman Okun, however, did not participate in the review. See <u>Final Determination</u>, USITC Pub. 3309 at 1. The ITC's <u>Final Determination</u> is readily accessible on the internet at http://www.usitc.gov/wais/reports/arc/w3309.htm. Pagination throughout this opinion is matched to the official internet publication.

subject to the 1976 finding and, accordingly, Commerce published an antidumping duty order on TRBs from Japan on October 6, 1987.[2] See Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan ("Antidumping Duty Order"), 52 Fed. Reg. 37,352 (October 6, 1987).

On April 1, 1999, the Commission issued notice of its five-year ("sunset") reviews concerning antidumping duty orders on certain bearings, including TRBs from Japan, to determine whether revocation of the orders would be likely to lead to continuation or recurrence of material injury. See Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 64 Fed. Reg. 15,783 (April 1, 1999). On July 2, 1999, the Commission determined that it would conduct full reviews.[3] See Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 64 Fed. Reg. 38,471 (July 16, 1999). Notice regarding

---

[2] The 1987 Order covered TRBs defined under the Tariff Schedules of the United States ("TSUS") "item numbers 680.30 and 680.39; flange, take-up cartridge, and hanger units incorporating [TRBs], . . . classified under TSUS item number 681.10; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use, and . . . classified under TSUS item 692.32 . . . ." Antidumping Duty Order, 52 Fed. Reg. at 37,352.

[3] In a five-year review, the ITC may conduct a full review, which includes a public hearing, issuance of questionnaires and other procedures, or an expedited review not encompassing such procedures. See 19 C.F.R. §§ 207.60(b)-(c) & 207.62(c)-(d) (1999).

scheduling and a public hearing was published on August 27, 1999, see Certain Bearings from China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 64 Fed. Reg. 46,949-50 (August 27, 1999), and the hearing, allowing all interested parties to comment, was held on March 21, 2000. See Final Determination, USITC Pub. 3309 at 2.

The Commission made a final determination regarding the effect of revoking the antidumping duty order on TRBs from Japan in June 2000, and concluded that lifting the order would not likely lead to continuation or recurrence of material injury to any domestic industry within the reasonably foreseeable future.[4] Timken advances several challenges to the Commission's negative determination, and contends that the finding was unsupported by substantial evidence or otherwise contrary to law because of its reliance on, inter alia, illogical reasoning, incomplete record evidence and incorrect conclusions regarding price underselling.

---

[4] Commissioner Miller issued a separate and dissenting opinion. See generally Final Determination, USITC Pub. 3309, Separate and Dissenting Views of Commissioner Marcia E. Miller at 83. The remaining three commissioners (Askey, Bragg and Hillman) and Chairman Koplan voted in favor of revocation. Commissioner Bragg clarified her negative determination via footnotes added to the ITC's opinion and expounded separate views in another opinion regarding cumulation (which is not at issue in the case at bar). See Final Determination, USITC Pub. 3309 at 45 n.310. Commissioner Askey also issued a separate opinion regarding her negative determination. See generally Final Determination, USITC Pub. 3309, Concurring and Dissenting Views of Commissioner Thelma J. Askey ("Askey's Views") at 1.

See Mem. P. & A. Supp. Timken's Mot. J. Agency R. ("Timken's Mem.") at 55. The ITC and defendant-intervenors, NSK Ltd. and NSK Corporation ("NSK"), NTN Bearing Corporation of America, NTN Bower Corporation, American NTN Bearing Manufacturing Corporation and NTN Corporation ("NTN"), and Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"), oppose Timken's claims.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000) and 28 U.S.C. § 1581(c) (2000).

## Standard of Review

The Court will uphold the Commission's final determination in a full five-year sunset review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States, 24 CIT 385, 389-90, 104 F. Supp. 2d 110, 115-16 (2000)(detailing the Court's standard of review for agency determinations). "'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229

(1938)). "[T]he possibility of drawing two inconsistent conclusions from the [same] evidence does not" preclude the Court from holding that the agency finding is supported by substantial evidence. <u>Consolo v. Federal Mar. Comm'n</u>, 383 U.S. 607, 620 (1966). An agency determination will not be "overturned merely because the plaintiff 'is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination.'" <u>Torrington Co. v. United States</u>, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990)(internal citation omitted), <u>aff'd</u>, 938 F.2d 1276 (Fed. Cir. 1991).

## Discussion

### I.   Statutory Background

In a five-year review, the ITC determines whether revocation of an antidumping duty order would likely "lead to continuation or recurrence of dumping . . . [and] material injury." 19 U.S.C. § 1675(c)(1) (1994). The Statement of Administrative Action ("SAA")[5]

---

[5]      The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Doc. No. 103-316, at 656 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." <u>Id.</u>; <u>see also</u> 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which

(continued...)

clarifies that the standard applied to determine whether it is "likely" that material injury will continue or recur is different from the standards applied in material injury or threat of material injury determinations. See H.R. Doc. No. 103-465, at 883 (1994), reprinted in 1994 U.S.C.C.A.N. at 4209. Specifically, "under the likelihood standard, the Commission will engage in a counter-factual analysis: it must decide the likely impact in the reasonably foreseeable future . . . [due to] revocation" of an antidumping order. H.R. Doc. No. 103-465, at 883-84, reprinted in 1994 U.S.C.C.A.N. at 4209.

In its 19 U.S.C. § 1675a(a)(1) determination, the Commission continuously considers "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . ." 19 U.S.C. § 1675a(a)(1) (1994). Title 19 of the United States Code also states that the Commission shall consider:

>       (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued . . . ,
>
>       (B) whether any improvement in the state of the industry is related to the order . . . ,
>
>       (C) whether the industry is vulnerable to material

---

(...continued)
a question arises concerning such interpretation or application.")

injury if the order is revoked . . . , and

> (D) in an antidumping proceeding under [19 U.S.C. § 1675(c)] . . . , the findings of the administering authority regarding duty absorption under [19 U.S.C. § 1675(a)(4)] . . . .

19 U.S.C. § 1675a(a)(1)(A)-(D) (1994). Guidance regarding the basis for the Commission's determination is also provided in 19 U.S.C. § 1675a(a)(5) (1994). In pertinent part, the statute reads that:

> [t]he presence or absence of any factor which the Commission is required to consider under [19 U.S.C. § 1675a] shall not necessarily give decisive guidance with respect to the Commission's determination of whether material injury is likely to continue or recur within a reasonably foreseeable time if the order is revoked . . . . In making that determination, the Commission shall consider that the effects of revocation . . . may not be imminent, but may manifest themselves only over a longer period of time.

19 U.S.C. § 1675a(a)(5). The SAA adds that although the Commission must consider all factors listed in 19 U.S.C. § 1675a(a)(1)(A)-(D), "no one factor is necessarily dispositive." H.R. Doc. No. 103-465, at 886, reprinted in 1994 U.S.C.C.A.N. at 4211.

## II.  Commission Findings

In the case at bar, the ITC voted 4 to 1 that revoking the antidumping duty order on TRBs from Japan would not likely lead to continuation or recurrence of material injury to any domestic industry within a reasonably foreseeable time. To determine whether TRBs from Japan compete with each other and with domestic

like products, the ITC generally considers four factors, which

include:

> (1) the degree of fungibility between the imports from different countries and between imports and the domestic like product, including consideration of specific costumer requirements and other quality related questions; (2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and (4) whether the imports are simultaneously present in the market.

Final Determination, USITC Pub. 3309 at 17 n.112 (referencing

Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp.

50, 52 (1989) (stating the factors considered by the ITC in a prior

final determination)).     However, since sunset reviews are

prospective in nature, the ITC also considers additional

"significant conditions of competition that are likely to prevail

if the orders [on TRBs from Japan] are revoked."      Final

Determination, USITC Pub. 3309 at  18.

### A.    Likely Volume of Subject Imports

In the ITC's Final Determination, the Commission found that

TRBs from Japan have significantly decreased since the imposition

of the 1987 Order, and attributed the decrease mainly to the

expansion of Japanese producers' facilities within the United

States. See Final Determination, USITC Pub. 3309 at 31. According

to the ITC, this substantial investment in domestic TRB production

facilities indicates that foreign producers are "committed to their U.S. operations and import to complement, rather than displace, their U.S. production." Id. The Final Determination indicates that a review of the record does not lead the Commission to the conclusion that Japanese producers will alter their focus on strengthening their U.S. facilities in the reasonably foreseeable future. See id. Instead, the data representing almost all TRB production in Japan indicates that Japan has "extremely high" capacity utilization rates. See id. Moreover, since "machinery and equipment needed for TRB production are highly specialized and generally dedicated to TRBs, there is little potential that Japanese producers would shift production in Japan from other types of bearings to TRBs."[6] Id. at 31-32. Finally, since Japanese TRB producers inventory-to-shipment ratios were low and Japanese TRB producers were not predominantly "export-oriented," the ITC determined that Japan was not likely to increase the volume of its TRB imports to the United States if the 1987 Order were revoked.

---

[6]    Commissioner Bragg adds in a footnote that specific Japanese TRB producers, which have established a physical presence in the United States, will probably not engage in export behavior that will harm the monetary interests of their United States facilities. However, Commissioner Bragg notes that this rationalization of production within a family of affiliated companies, in and of itself, does not indicate the likely behavior of Japanese imports as a whole in the event of revocation. See Final Determination, USITC Pub. 3309 at 31 n.204.

See id. 31-32.[7]

**B.    Likely Price Effects of Subject Imports**

In 1975, the ITC determined that TRBs, four inches and under, from Japan were sold in the United States for LTFV, and that the "LTFV margins were a material factor in the margins of underselling by the Japanese producers."  Final Determination, USITC Pub. 3309 at 32.  Later, in 1987, the ITC found that "the value of cumulated subject imports was increasing at a time of decreasing shipments by domestic producers[,] and that underselling by cumulated subject imports at a time of declining U.S. prices was fairly consistent." Id.

The Final Determination at issue in the case at bar, however, was predicated on pricing data that shows "infrequent underselling by Japanese TRB imports . . . for the lower volume sales.  The more

---

[7]    Commissioner Askey cumulated the volume of subject imports from China and Japan and concluded a significant increase in subject imports (that is, TRBs from China and Japan) is unlikely in the event of revocation of the antidumping orders.  See Final Determination, USITC Pub. 3309, Askey's Views at 10.  Commissioner Askey based her views on the record, which indicates, inter alia, that: (1) little available, unused capacity in Japan (or alternatively, existence of high capacity utilization rates); (2) Japanese and Chinese TRB producers ship the majority of their TRBs to their home markets; (3) lack of incentive for Japanese to alter their shipping habits; (4) the domestic industry does not have sufficient capacity to fully serve the United States market; and (5) subject imports lost market share after issuance of the 1987 Order that was later gained by non-subject imports.  See id. at 10-12.

significant pricing data, for high-volume sales, show consistent overselling by Japanese imports, at significant margins of overselling."  Id. (emphasis added).  Accordingly, the ITC concluded that revocation of the antidumping order is unlikely to lead to any significant underselling, and that "subject imports from Japan would not be likely to depress or suppress U.S. prices to any significant degree.  In particular, with high capacity utilization and commitments to third-country markets, the Japanese producers do not have an incentive to price aggressively to gain additional U.S. market share."  Id. at 33.[8]

## C.    Likely Impact of Subject Imports

In 1975, the ITC acknowledged a deterioration in the domestic TRB industry, and made an affirmative material injury determination due to the market penetration of the TRB industry by Japanese producers and underselling of Japanese imports. See Final Determination, USITC Pub. 3309 at 33.  In the Final Determination, the ITC found an improvement in the domestic TRB industry since the 1987 Order and concluded that the United States industry is not currently vulnerable.  The Commission found that:

---

[8]    Commissioner Askey generally agreed with the ITC majority views, and adds that domestic prices are likely to rise in the foreseeable future, given expectations of increased demand, high capacity utilization levels of the United States TRB industry and the domestic markets' inability to meet such rising demand. See Final Determination, USITC Pub. 3309, Askey's Views at 10-18.

> [t]he TRB market is expanding; apparent consumption increased by 7.3 percent from 1997 to 1998 and was up about 1.6 percent in interim 1999 compared to interim 1998. The industry is highly concentrated and profitable. The domestic industry's market share has increased to the level held during the original 1987 investigation as capacity and capacity utilization increased substantially. Because of the absence of significant likely volume and price effects, [the Commission found] that revocation of the antidumping finding and order on TRB imports from Japan would not be likely to impact significantly the domestic industry's output, sales, market share, profits, or return on investment.

Id. at 33 (footnote in original omitted).

## III. Analysis

### A. Original Investigation

#### 1. Contentions of the Parties

Timken argues that the Final Determination is unsupported by substantial evidence and otherwise not in accordance with law because, inter alia, the ITC failed to consider the information obtained and conclusions drawn by the Commission in prior injury determinations. See Timken's Mem. at 75-92. According to Timken, 19 U.S.C. § 1675a(a)(1)(A) clearly instructs the Commission to consider findings from the original investigation "as a source of highly probative evidence." Id. at 76. In its moving brief, Timken points to the record supporting the original 1976 Finding and 1987 Order (collectively "original investigations") and explains that dumping by Japanese TRB producers caused the original

deterioration of the domestic TRB market.  See id. at 21-24. According to Timken, "Japanese TRB producers continue to be formidable competitors in the U.S. market[,]" id. at 24, and since TRBs are "fully interchangeable" commodities, regardless of place of production, the competition between TRB markets is primarily price-based.  See id. at 25-26.  Timken speculates that any revocation of orders currently in place will likely lead to the recurrence of material injury, and references Commerce's prior revocation of an order on TRBs imported by NTN to prove that subsequent dumping of TRBs in the United States was a result of such revocation.  See id. at 22.

Timken also states that continued dumping, despite the 1987 Order, "has reduced industry revenues to such a degree that Timken . . . has been unable to earn its cost of capital[9] for almost the past twenty years.  Timken has lost [a substantial amount] in operating profits from 1996 to . . . [1999] due to lost volume and prices reduced to meet competition from dumped imports."  Id. at 39-40.  According to Timken, adequate explanations were not provided for the inconsistent conclusions drawn by the ITC in its Final Determination, when compared to those drawn in the 1987 determination, regarding volume, including: (1) increased

---

⁹    Timken defines cost of capital as "the minimum rate of return demanded by shareholders and lenders."  See Timken's Mem. at 37.

investment in U.S. facilities; (2) high capacity utilization rates; (3) low inventory-to-shipment ratios; (4) product shifting; and (5) market orientation. See id. at 78-92. Timken contends that such lack of consistency and explanation renders the Commission's determination arbitrary. Generally, Timken argues that revocation of the order will lead to an increase in dumped Japanese imports of the subject merchandise and the ultimate depression of domestic TRB prices within two years. See id. at 45.

The ITC argues that Timken "fundamentally misconstrues" the Commission's statutory requirements regarding five-year reviews. See Mem. Def. ITC Opp. Pl.'s Rule 56.2 Mot. J. Agency R. ("ITC's Mem.) at 24-26. The ITC contends that 19 U.S.C. § 1675a(a) "directs the Commission to consider a broad range of factors[, in addition to the original investigations,] to determine whether revocation of an order would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." Id. at 24 (emphasis added). Accordingly, the ITC considers Timken's arguments, that the Final Determination is not supported by substantial evidence or in accordance with law, unpersuasive because they hinge on one isolated factor, namely, the original determination. See id. at 24-28. Furthermore, the ITC considers the original determination not dispositive because "[t]here are fundamental differences between the Commission's examination of the

likelihood of continuation or recurrence of material injury in five-year reviews and its examination of material injury or threat of material injury by reason of subject imports in original antidumping duty investigations." Id. at 26. Specifically, since the Commission's analysis in five-year reviews is counter-factual and prospective, and because the United States Code does not explicitly instruct the Commission to distinguish its original investigation findings, the ITC is merely obligated to "take into account" its prior injury determination, and consider such a finding "just one of many factors" in its determination. See id. at 26-28.

The ITC also denies Timken's contention that it completely disregarded the results of its original determination. "Timken [improperly] []characterizes the Commission's volume findings in the original investigation . . . [since] the Commission cumulated subject imports from Japan with subject imports from" five other countries. Id. at 29 (citation omitted). According to the ITC, this distinction is of particular importance because Timken attempts to compare volume data specific to Japan from the original investigation with volume data on Japan from the sunset review. See id. at 30. The ITC views this practice as "comparing apples to oranges," and considers the 1986 Japan-specific volume data discussed by the Commission in the five-year review as not being

the basis for the original affirmative determination.  See id.
Furthermore, the ITC argues that the data discussed by Timken in
its moving brief was not even relied on in the original
determination, and that no statutory requirement exists mandating
the Commission to consider findings never made in the original
investigation.  See id. at 31.

NTN, Koyo and NSK generally agree with the Commission that the
Final Determination is supported by substantial evidence and in
accordance with law.  Koyo adds that Timken "ignores the fact that
Congress has set forth a variety of factors the Commission must
take into account [in a sunset review], only one of which is the
original determination."  Mem. Koyo Resp. Timken's Mot. J. Agency
R. ("Koyo's Mem.") at 23.  Moreover, Koyo argues that since the
original investigation, significant changes have occurred in the
TRB industry that were considered by the Commission in the Final
Determination.  See id. at 23-24.

### 2.   Analysis

Duty absorption findings regarding TRBs from Japan were made
in the 1995-96 and 1997-98 administrative reviews of the subject
imports. See App. Mem. NSK Opp'n Timken's Rule 56.2 Mot. J. Agency
R. app. 2, at TRB-I-7.  The United States Code directs the ITC to
conduct a sunset review five years after the publication of an
antidumping duty order or prior sunset review.  See 19 U.S.C. §

1675(c)(1) (1994). In a sunset review, the ITC determines "whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1). Such a determination takes into account the likely volume, price effect and impact of the subject imports if the order were revoked. See id. The ITC is also directed to consider various additional factors when making its determination, including: (1) prior injury determinations; (2) any improvement in the subject industry relating to the issuance of an antidumping duty order; and (3) the subject industry's vulnerability to material injury if the order is revoked. See id.; see also H.R. Conf. Rep. No. 98-1156, at 9, 17b (1984), reprinted in 1984 U.S.C.C.A.N. 5220, 5291-300 (determination of threat requires careful review of current, identifiable trends in the subject industry); American Permac, Inc. v. United States, 831 F.2d 269, 273-74 (1987); Matsushita, 750 F.2d at 932.

Although Timken is correct in asserting that the antidumping statute directs the Commission to take into account its prior injury determination in a sunset review, findings from the original investigations are by no means dispositive. See H.R. Doc. No. 103-465, at 886, reprinted in 1994 U.S.C.C.A.N. 4210-11 (stating that in a sunset review, no one factor is dispositive); see also 19 U.S.C. § 1675a(a)(5) (stating that the presence or absence of any

one factor shall not necessarily give decisive guidance with respect to the Commission's sunset review determination). The parties to this action do not dispute that the Commission is required to consider its prior injury determination in its sunset review. The SAA clarifies the importance of taking into account the periods of review prior to the issuance of an antidumping finding or order. See H.R. Doc. No. 103-465, at 884, reprinted in 1994 U.S.C.C.A.N. 4209. According to the SAA, "[i]f the Commission finds that pre-order . . . conditions are likely to recur, it is reasonable to conclude that there is likelihood of continuation or recurrence of injury." Id. However, neither the statute nor its legislative history directs the ITC to distinguish every factor of its original investigation findings from those made in a sunset review determination.

The ITC did not disregard findings from its original investigations, but rather cited to such findings in the administrative record at issue in this case. See Final Determination, USITC Pub. 3309 at 31-33. The Commission discussed its negative determination in terms of the likely volume, price effects and impact of subject imports while incorporating and distinguishing various aspects of the original investigation, where appropriate. See id. For example, the Commission explained, inter alia, that: (1) subject imports from Japan have decreased since the

1987 Order; (2) Japanese investment in domestic TRB producing facilities has steadily increased in the last 25 years; and (3) there has been a general improvement in the domestic TRB industry since the 1987 investigation.  See id.

In its moving brief, Timken isolates factor after factor from the original investigation and argues that the ITC drew an incorrect conclusion with regard to such factors in its sunset review determination.  However, in its analysis, Timken fails to account for changes of conditions of competition that occurred between the time the order was imposed and the five-year review, such as significant increases in Japanese investment to domestic TRB producing affiliates.  Compare Timken's Mem. at 75-92, with Final Determination, USITC Pub. 3309 at 24-26, 38 (stating that the Commission's analysis is based on current conditions of competition.  Accordingly, Timken did not consider "whether injury is imminent, given the status quo."  H.R. Doc. No. 103-465, at 883, reprinted in 1994 U.S.C.C.A.N. 4209.  Timken's arguments regarding the original investigation actually concern how the Commission is to weigh the findings from the original investigations in its sunset review determination.  It is well established that it is the agency's function to weigh the evidence and, therefore, this Court cannot substitute conclusions that are reasonable and supported by substantial evidence drawn by the Commission after

review of the record, with those presented by Timken. <u>See</u> <u>Torrington Co. v. United States</u>, 16 CIT 220, 226, 790 F. Supp. 1161, 1169 (1992), <u>aff'd mem.</u>, 991 F.2d 809 (Fed. Cir. 1993); <u>see</u> <u>also</u> <u>Coalition for Preservation of Am. Brake Drum & Rotor</u> <u>Aftermarket Mfrs. v. United States</u>, 22 CIT 520, 529-30, 15 F. Supp. 2d 918, 927 (1998). Therefore, the Court rejects the conclusions drawn by Timken regarding the Commission's failure to consider findings from the original investigation in its sunset review determination.

### B. Japanese Investment in U.S. Facilities

#### 1. Contentions of the Parties

In its moving brief, Timken contends that the Commission made an illogical determination that Japanese producers are committed to their domestic TRB facilities and unlikely "to alter their current focus on U.S. TRB production in the reasonably foreseeable future." <u>Final Determination</u>, USITC Pub. 3309 at 31; <u>see</u> Timken's Mem. at 57-75. Timken begins its argument by presenting a syllogism, which it claims the Commission's <u>Final Determination</u> was based, and finds error in the syllogism's conclusion that Japanese producers will not increase imports to undercut the rest of the United States industry in order to protect their domestic interests.[10] <u>See</u> <u>id.</u>

---

[10] The Court does not agree that the syllogism presented by Timken accurately reflects the reasoning of the agency. The data

(continued...)

Timken also argues that capital investments in foreign-owned, domestic facilities and presence in the domestic TRB market "did nothing to deter [Japanese producers] from dumping [TRBs into the United States market] prior to the [1976 and 1987] orders, increasing imports, or from continuing dumping after the orders were put in place." App. Administrative R. Docs. Cited Timken's Mem. Supp. Mot. J. Agency R. app. 7, at 21 n.60. Timken adds that domestic investment has not been a relevant factor in making the Commission's negative determination, with exception to one review distinguished by Timken.[11] See Timken's Mem. at 65. Timken further points to a prior investigation where the ITC issued an affirmative determination when 30 percent of domestic production was "foreign-owned." See id. at 65 (citation omitted). In addition, Timken

_____

(...continued)
considered by the ITC when making its final determination is much too voluminous and complicated to be reduced to a simple syllogism composed of only three premises. Accordingly, the Court rejects this argument. However, the Court notes Timken's observation that not all Japanese TRB producers have increased investments in domestic facilities.

     [11]  In this review, the Commission found it reasonable to infer that one company, which dominated the domestic industry and was owned by a Japanese parent company that was also parent company to the competing foreign producer, was not threatened with material injury by foreign imports from the same foreign producer. See Timken's Mem. at 65 (citing 12-Volt Motorcycle Batteries From Taiwan, Inv. No. 731-TA-238 (Final), USITC Pub. 2213 (Aug. 1989); see also 12-Volt Motorcycle Batteries From Taiwan, 54 Fed. Reg. 35,089 (Aug. 23, 1989). Timken distinguishes this investigation by stating that Timken, an independent producer, and not Japanese manufacturers, was the "dominant U.S. producer." See Timken's Mem. at 65 n.244 (quoting Final Determination, USITC Pub. 3309 at 28.

identifies three reviews, two that were issued after the determination before this Court, which admit that foreign investment in the domestic market does not conclusively show injury to be unlikely.  See Timken's Mem. at 67 (referring to Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, the Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, USITC Pub. 3364 (Nov. 2000); Gray Portland Cement and Cement Clinker From Japan, Mexico, and Venezuela, USITC Pub. 3361 (Oct. 2000)).  Generally, Timken characterizes the Commission's finding in the Final Determination as inconsistent with other sunset reviews because the ITC did not weigh several relevant factors in the same manner in each review.  See Timken's Mem. at 66-75.  In addition, Timken argues that the Commission's "commitment" finding did not account for the impact of revocation on the entire domestic industry, but only considered the prospective effects on NTN and Koyo's U.S. affiliates.  See id. at 58-59.

The ITC rejects Timken's arguments regarding Japanese TRB producers' substantial investment in their U.S. facilities because they ignore "an important distinction between the original investigations and the more recent period examined during the five-year review."  ITC's Mem. at 32.  This distinction deals with the

change in volume of TRBs supplied to the United States through
Japanese producers and their U.S. affiliates from the original
investigation and the recent sunset review.  See id. (referencing
various confidential data).  This data led to the Commission's
conclusion that Japanese commitment to domestic facilities would
continue and would likely limit the volume of subject imports from
Japan in the reasonably foreseeable future. See id. at 32-33.

> [T]he Commission found that Japanese producers
> substantially increased their investment in U.S.
> production facilities since the original investigations.
> The record demonstrated that NTN Bearing Corporation of
> America began production in the United States in 1975 and
> increased TRB production at various facilities throughout
> the United States in 1988, 1990, 1992, 1994, 1998, and
> 1999. . . .   NTN increased capital expenditures in its
> U.S. bearings production facilities from . . . 1990 to .
> . . 1999. . . .   Koyo [substantially] increased its
> investments in U.S. facilities from . . . 1986 to . . .
> 1998. . . .   The record also supported the Commission's
> finding that the operation of the U.S. facilities
> reflected, at least in part, a trend by large
> multinational bearings manufacturers to localize
> production facilities in response to customers' needs and
> to allocate production more efficiently.

Id. at 33 (citation and footnote omitted).  Japanese producers
characterized their increased investments in U.S. production
facilities as a "larger global strategy to localize production" and
meet demand.  Id. at 33 n.25.  The Commission, therefore, concluded
that Japanese producers lacked incentive to increase imports of
subject merchandise in the event of revocation

> because increased volumes of TRBs from Japan would
> adversely affect their U.S. affiliates' volumes or
> prices. . . .   [The ITC explained that b]ecause of the

industry's high fixed costs, production facilities operate[] at high capacity utilization rates in order to maximize return on investment, and TRB facilities could not generally be used to make other types of bearings without expensive retooling. . . . Moreover, a substantial proportion of TRBs were consumed by large [original equipment manufacturer ("OEM")] customers, particularly in the automotive and construction sectors, and the record indicated that OEMs often required certification of facilities, a cumbersome process, and they were not likely to change suppliers merely on the basis of price.

Id. at 34.

Responding to Timken's contentions regarding the Commission's inconsistent analyses in numerous antidumping investigations, the ITC argues that changing conditions in competition often warrants different outcomes in each investigation. See id. at 35. Furthermore, unlike a five-year review, the Commission examines historical data in an original investigation to determine whether the industry is currently materially injured or under the threat of material injury. See id. at 36-37. In other words, the Commission's analysis is based on "current conditions and extrapolations of current conditions." Id. at 38. The ITC points out that the SAA mandates the Commission to engage in a "counter-factual analysis" that is prospective in nature when conducting a five-year review. See id. at 37 (citation omitted). Accordingly, the ITC argues that it properly examined the likely volume of subject imports by determining whether Japanese producers are discouraged from increasing their imports in order to avoid

injuring their domestic affiliates. See id. at 37-38. The ITC considered the record evidence to weigh in the favor of the conclusion that Japanese TRB producers will not risk harm to their domestic investments in several five-year reviews. See id. at 38-41.[12]

NTN, Koyo and NSK generally support the arguments espoused by the ITC. NTN adds that the Commission's determination regarding Japanese producers' commitment to their domestic facilities "was one of many factors used to determine the likely effect of revocation of the antidumping order on the entire U.S. TRB industry. This is evidenced by the ITC's discussion with respect to the conditions of competition in the TRB industry," in addition to the likely volume, price effects and impact of subject imports. Resp. NTN to Timken's Jan. 30, 2001 Br. Supp. Mot. J. Agency R. ("NTN's Resp.") at 13. NTN further asserts that the ITC is not mandated to discuss every piece of record evidence it considered in support of the final determination, and that the Commission

---

[12] The ITC explains that in the sunset reviews of Color Picture Tubes From Canada, Japan, Korea and Singapore, Inv. Nos. 731-TA-367-370 (Review), USITC Pub. 3291 (Apr. 2000), Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, Japan, Korea, the Netherlands, and Sweden, Inv. Nos. 731-TA-311-317 & 379-380 (Review), USITC Pub. 3290 (Apr. 2000), and final determination of 12-Volt Motorcycle Batteries From Taiwan, USITC Pub. 2213, the Commission considered the relationship of foreign producers with their domestic affiliates in determining that an increase in the volume of subject imports by such foreign producers would be unlikely. See ITC's Mem. at 39-40.

reviewed the record on a whole and explained its determination adequately. See id. at 18 (citing Acciai Speciali Terni S.p.A. v. United States, 24 CIT 1064, 1080-81, 118 F. Supp. 2d 1298, 1313 (2000)).

### 2. Analysis

Timken argues that since Japanese investment in the domestic industry was not a relevant factor in the Commission's original determination or in over sixty prior antidumping cases, the ITC's current determination that U.S. investment will preclude injury or threat of material injury in the foreseeable future, is illogical, unsupported by substantial evidence and otherwise contrary to law.[13] See Timken's Mem. at 55-74. The Court agrees with Timken that it

---

[13] Commissioner Bragg did not rely on this finding in her analysis, but still concluded that revocation of the order will not be likely to lead to continuation or recurrence of material injury in the reasonably foreseeable future. See Final Determination, USITC Pub. 3309 at 31 n.204. Specifically,

Commissioner Bragg acknowledge[d] that an individual Japanese TRB producer with an established physical presence in the United States is unlikely to engage in export behavior to the detriment of its affiliated U.S. production operations. . . . [H]owever, such rationalization . . . in and of itself, says nothing about the likely behavior of Japanese imports as a whole in the event of revocation, nor does it provide an indication of the likely impact of Japanese imports on unaffiliated producers (whether U.S. or foreign-owned) within the domestic industry.

Id. This finding did not preclude Commissioner Bragg from concluding that revocation of the order would not be likely to lead to the continuation or recurrence of material injury in the reasonably foreseeable future.

is anomalous to consider foreign investment in the domestic
industry as a relevant factor in the determination under review,
while failing to consider the same factor in the original
investigation. It is important to note, however, that the ITC's
final determination was not dependent on one single factor, namely,
foreign investment in the domestic industry, but rather considered
various other conditions. See Final Determination, USITC Pub. 3309
at 21-34 (discussing, inter alia, the general increase in demand
for TRBs, increases in domestic shipments of TRBs in the United
States and abroad, and high capacity utilization rates). Moreover,
the SAA explains that the standard applied to determine whether it
is "likely" that material injury will continue or recur, applicable
in sunset reviews, is different from the standards applied in
material injury or threat of material injury determinations,
applicable in original investigations. See H.R. Doc. 103-465, at
883, reprinted in 1994 U.S.C.C.A.N. at 4209. In a five-year
review, the Commission "engage[s] in a counter-factual analysis" to
determine the likely impact of revocation "in the reasonably
foreseeable future of an important change in the status-quo . . .
." Id. Similar to other reviews discussed by Timken, the
Commission weighed all of the evidence before it and reasonably
concluded that Japanese producers presently lack incentive to
increase imports of subject merchandise in the reasonably
foreseeable future

because increased volumes of TRBs from Japan would adversely affect their U.S. affiliates' volumes or prices. . . . [The ITC explained that b]ecause of the industry's high fixed costs, production facilities operate[] at high capacity utilization rates in order to maximize return on investment, and TRB facilities could not generally be used to make other types of bearings without expensive retooling. . . . Moreover, a substantial proportion of TRBs were consumed by large OEM customers, particularly in the automotive and construction sectors, and the record indicated that OEMs often required certification of facilities, a cumbersome process, and they were not likely to change suppliers merely on the basis of price.

ITC's Mem. at 34 (citation to administrative record omitted).

Legislative intent makes clear that "a reviewing court is not barred from setting aside [an agency] decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (emphasis added); see e.g., Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997) (clarifying the standard of review for ITC determinations). Therefore, it was reasonable for the Commission to review the entire administrative record and consider foreign investment in the domestic industry as a factor in its five-year review. However, Timken is correct in its assertion that the Final Determination does not adequately explain why an increase in Japanese imports of the subject merchandise would not injure the remaining United States industry;

that is, TRB producers other than those owned by Japanese companies. Since 19 U.S.C. § 1675a(a)(4) explicitly directs the Commission to evaluate "the likely impact of imports of the subject merchandise on the [domestic] industry," the Court remands the Final Determination for further explanation.

### C. Utilization Rates

#### 1. Contentions of the Parties

Timken also argues that the ITC failed to investigate the issue of capacity utilization ratios by not inquiring as to "how Japanese TRB producers had reported their capacit[ies]," Timken's Mem. at 94, and not investigating questionable reporting methods of Japanese TRB producers. See id. 94-95. Timken asserts that "[c]apacity utilization ratios are based on a plant's total production of a particular product[, in this case TRBs,] divided by [the plant's] total capacity to produce th[is] product. . . . [Such] 'capacity' can vary depending on" numerous factors. Id. at 97. Although the ITC's 1987 questionnaire (used to collect data for the original investigation on TRBs from Japan) requested TRB producers to give detailed information regarding such various factors that effect capacity utilization ratios, Timken states that the Commission did not request any such information in the sunset review, despite Timken's repeated warnings to the ITC of the importance of gathering such information. See id. at 98-100.

   Timken also asserts that the ITC never requested Japanese TRB producers to explain their methods of reporting capacity data nor mandated such producers to explain inherent inconsistencies between the information supplied to the Commission and other associations. See id. at 97-109.

   The ITC supports its finding that Japanese producers had extremely high capacity utilization rates during the five-year period of review, which, according to the Commission, was based on data supplied by a representative portion of the Japanese TRB production. According to the ITC, the Commission "used the same definition of 'average production capacity' that it typically includes in questionnaires it sends to the domestic and foreign producers in five-year reviews and original investigations." ITC's Mem. at 41. The ITC rejects Timken's argument regarding the amount of information that the Commission is required to collect in a five-year review, and states that "Timken cites no authority in support of the proposition that a Commission investigation is inadequate unless the Commission decides to seek every piece of information a party requests." Id. at 42. Instead, the ITC contends that the size and scope of a TRB investigation made it impractical "for the Commission to collect every piece of information in the degree of detail requested by [Timken]." Id. at 43. The ITC also considered the additional information supplied by

Timken to be of minimal "probative value."[14]  See id. at 43-44.

NTN, Koyo and NSK generally support the arguments presented by the ITC.  NTN adds that "Timken ma[d]e[ a] broad assumption that a production increase based on unused capacity would lead to increased exports to the U.S."  NTN's Resp. at 35.  Moreover, Koyo argues that Timken's argument regarding capacity utilization ratios focuses on only one of many reasons the Commission found that the volume of imports from Japan was not likely to increase significantly after revocation, "and ignores the substantial changes in the U.S. industry and worldwide competition since th[e] original determinations."  Koyo's Resp. at 32.

### 2.   Analysis

"[T]he question of whether the ITC conduc[ted] a thorough . . . investigation begins with the substantial evidence test, and the question of whether, in light of the record evidence as a whole, 'it would have been possible . . .'" for the Commission to have reasonably reached its final determination.  Acciai Speciali, 24

---

[14]    The ITC contends that "[t]he reporting basis for capacity utilization was not defined in [Timken's] secondary [data,] and Timken expected the Commission to assume that the reporting basis was the same as that described in a glossary also provided by Timken that was dated several years earlier."  ITC's Mem. at 44. Since Timken's additional information consisted of this and other inconsistencies, the ITC determined that it is reasonable to reject such data and rely only on the information collected by Japanese producers during the five-year review.  See id. at 44.

CIT at 1074, 118 F. Supp. 2d at 1307 (citing <u>Allentown Mack Sales & Serv., Inc. v. NLRB.</u>, 522 U.S. 359, 366-67 (1998)). According to the ITC, the size and scope of the sunset review made it impractical for the Commission to collect "every piece" of information in connection with the investigation. <u>See</u> ITC's Mem. at 43. The Court recognizes that the size and scope of TRB investigations may be enormous, but notes that <u>Mitsubishi Elec. Corp. v. United States</u>, 12 CIT 1025, 1058, 700 F. Supp. 538, 564 (1988), <u>aff'd</u>, 898 F.2d 1577 (Fed. Cir. 1990), clarified that where the "ITC actively precludes itself from receiving relevant data or [m]akes no effort to seek relevant [contrary] data . . . then such actions will be found to be contrary to law."

The ITC explains that its finding regarding Japanese producers' high capacity utilization rates was derived from questionnaire responses from five TRB producers that were representative of almost all subject merchandise production in Japan. <u>See</u> ITC's Mem. at 41. The ITC further points out that it rejected secondary information presented by Timken because the reporting basis used in such data was undefined. <u>See</u> <u>id.</u> at 44. With this impetus, it is logical to find that the Commission erred by not inquiring into the basis used by Japanese TRB producers to report their capacity. Such a distinction is particularly important since the Court is not aware of any standard industry

measure of capacity to produce TRBs.  Accordingly, the Court remands the <u>Final Determination</u> to the ITC for further investigation.

### D.   The ITC's Vulnerability Finding and Other Volume, Price and Subject Import Findings

#### 1.   Contentions of the Parties

Timken argues that the Commission's findings regarding vulnerability of the domestic market and the likely continuation of material injury in the event of revocation are unsupported by substantial evidence.  <u>See</u> Timken's Mem. at 121.  Although Timken admits that the domestic TRB industry has improved since 1987, future vulnerability must be assessed "in light of the type of industry and its current conditions."  <u>Id.</u> at 124.  Timken asserts that the Commission failed to consider information pertaining to the domestic industry's return on investments and ability to raise capital as a result of Japanese producers' continued dumping when making its vulnerability finding.  <u>See</u> <u>id.</u> at 132.  Timken, therefore, asks this Court to remand the Commission's <u>Final Determination</u> in order for the ITC to explain its reasoning with respect to the domestic market's vulnerability after revocation, and justify the rejection of Timken's arguments, proposed during the sunset review, with respect to continuation of material injury.

Timken also argues that in the sunset review, the Commission

relied on Japanese pricing data covering only a fraction of Japanese imports. See id. at 114. Such data, therefore, led the Commission to incorrect conclusions regarding price factors such as underselling, and ultimately to an erroneous negative determination. See id. at 115-18.

The ITC argues that its conclusion that the volume of imported TRBs from Japan was not likely to significantly increase is supported by substantial evidence. The ITC states that its conclusion was based on findings relating to Japanese producers' orientation to home and third-country markets and low inventory to shipment ratios, and considered the level of difficulty and expense to Japanese producers who engage in product shifting. See ITC's Mem. at 45. According to the ITC, its findings were based on record evidence, which indicated that:

> [(1)] commitments to existing customers and OEM requirements of certification . . . would likely limit Japanese producers' ability to transfer shipments between markets in the reasonably foreseeable future[; . . . (2)] there were no known import barriers to Japanese TRB shipments to third countr[y markets; . . . (3)] Japanese inventory-to-shipment ratios were low[; . . . and (4)] shifting production from one type of bearing to another was difficult and expensive.

Id. at 47. Contrary to Timken's contention, the ITC also asserts it properly considered the likely volume effects of TRB imports from Japan with respect to the entire domestic industry. See id. at 48.

In its final determination, the Commission also reviewed data collected in the sunset review showing pervasive overselling of the domestic like product by subject imports from Japan. Along with this information, the Commission considered findings from the original investigation and those of Commerce relating to duty absorption and concluded that TRBs from Japan were not likely to significantly undersell the domestic like product. See id. at 50. This finding flowed from the Commission's conclusion that subject import volume was not likely to significantly increase since high capacity utilization and commitments to third-country markets act as disincentives to Japanese producers who price aggressively to gain U.S. market share. See id.

The ITC also disagrees with Timken regarding the weight that is to be placed on evidence presented by parties to the Commission, and asserts that "it is the agency's task to weigh the evidence of record and reach a conclusion based on the facts found." Id. at 52 (citations omitted). Therefore, the Commission argues that it reasonably placed "less probative weight" on data presented by Timken regarding Japanese underselling because such information did not necessarily involve sales of TRBs imported from Japan, as opposed to TRBs produced by Japanese domestic affiliates, and the record indicated that TRB prices in third-country markets versus the domestic market were "mixed." See id.

Generally, the ITC asserts that record evidence regarding volume, price and subject imports supports the finding that the domestic industry was not vulnerable (or alternatively, in a "weakened state"). See id. at 58-60. According to the Commission, a small increase in the volume of subject imports from Japan would not likely suppress or depress domestic prices. See id. at 59. The ITC also asserts that the Commission "properly took into consideration the likely effects of revocation on the entire domestic industry, [and] not merely the likely effects of revocation on Timken." Id. at 61.

The ITC responds to Timken's contentions regarding the pricing data relied upon in the sunset review by admitting "that the pricing data represented a small sample of subject imports from Japan[, but argues that . . .] the thoroughness of the Commission's investigation" was not compromised. Id. at 53. However, the ITC contends that Timken has not adequately demonstrated that the pricing data collected by the Commission was unrepresentative of the subject imports. See id. at 54.

The ITC also notes that no specific findings regarding the business cycle were made in the original determination, and multiple attempts to collect related business cycle data from the domestic industry during the five-year review were unfruitful. See id. at 59-60. According to the ITC, Timken never made any

reference to the length of the United States TRB industry's business cycle during the five-year review, and is ultimately precluded from raising the issue pursuant to the doctrine of exhaustion of administrative remedies.  See id. at 59 n.52.

NTN, Koyo and NSK generally argue that the ITC's findings are reasonable, supported by substantial evidence and in accordance with law, and urge the Court to dismiss Timken's contentions as unpersuasive and without merit.

### 2.   Analysis

In five-year reviews, the antidumping statute directs Commerce to  revoke "an antidumping duty order or finding, . . . unless . . . the Commission makes a determination that material injury would be likely to continue or recur as described in [19 U.S.C. § 1675a(a)] . . . ."  19 U.S.C. § 1675(d)(2) (1994).  To determine whether revocation is likely to lead to the continuation or recurrence of material injury, 19 U.S.C. § 1675a(a)(1)(B) and (C) instructs the Commission to consider the current state of the domestic industry.  Moreover, 19 U.S.C. § 1675a(a)(4) (1994) provides a list of relevant economic factors that the Commission is to consider in determining the likely impact of imports after revocation.  The list includes, but is not limited to:

> (A) likely declines in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

> (B)  likely  negative  effects  on  cash  flow,
> inventories, employment, wages, growth, ability to raise
> capital, and investment, and
>        (C)  likely  negative  effects  on  the  existing
> development  and  production  efforts  of  the  industry,
> including  efforts  to  develop  a  derivative  or  more
> advanced version of the domestic like product.

19 U.S.C. § 1675a(a)(4).  The statute also clarifies that "[t]he

Commission shall evaluate all relevant economic factors . . .

within the context of the business cycle and the conditions of

competition that are distinctive to the affected industry."  Id.

(emphasis added).

> The presence or absence of any factor which the
> Commission is required to consider under [19 U.S.C. §
> 1675a(a)] shall not necessarily give decisive guidance
> with respect to the Commission's determination of whether
> material injury is likely to continue or recur within a
> reasonably foreseeable time if the order is revoked . .
> . .  In making that determination, the Commission shall
> consider that the effects of revocation . . . may not be
> imminent, but may manifest themselves only over a longer
> period of time.

19 U.S.C. § 1675a(a)(5).


In making its final determination, the Commission found that

TRBs from Japan have significantly decreased since the imposition

of the 1987 Order.  See Final Determination, USITC Pub. 3309 at 31.

This was, in large part, a result of substantial investment in

domestic TRB production facilities by Japanese producers.  See id.

The Final Determination also states that the data representing

almost all TRB production in Japan indicates that Japan has

"extremely high" capacity utilization rates.  See id.  Moreover,

since "machinery and equipment needed for TRB production are highly specialized and generally dedicated to TRBs, there is little potential that Japanese producers would shift production in Japan from other types of bearings to TRBs." Id. at 31-32. Another factor that the ITC considered in its determination was Japanese TRB producers' inventory-to-shipment ratios. Since they were low and Japanese TRB producers were not predominantly "export-oriented," the ITC determined that Japan was not likely to increase the volume of its TRB imports to the United States if the 1987 Order were revoked. See id.

The Commission also considered the likely price effects of subject imports in event of revocation. According to the Final Determination, the evidence showed "infrequent underselling by Japanese TRB imports . . . for the lower volume sales." Id. at 32. Accordingly, the ITC concluded that revocation of the antidumping order is unlikely to lead to any significant underselling, and that "subject imports from Japan would not be likely to depress or suppress U.S. prices to any significant degree. In particular, with high capacity utilization and commitments to third-country markets, the Japanese producers do not have an incentive to price aggressively to gain additional U.S. market share." Id. at 33.

Finally, the Commission considered the likely impact of subject imports in event of revocation. The ITC found an

improvement in the domestic TRB industry since the 1987 Order and concluded that the United States industry is not currently vulnerable.  The Commission found that:

> [t]he TRB market is expanding; apparent consumption increased by 7.3 percent from 1997 to 1998 and was up about 1.6 percent in interim 1999 compared to interim 1998.  The industry is highly concentrated and profitable.  The domestic industry's market share has increased to the level held during the original 1987 investigation as capacity and capacity utilization increased substantially.  Because of the absence of significant likely volume and price effects, [the Commission found] that revocation of the antidumping finding and order on TRB imports from Japan would not be likely to impact significantly the domestic industry's output, sales, market share, profits, or return on investment.

Id. at 33 (footnote omitted).

The Court rejects those arguments raised by Timken regarding findings pertaining to the domestic TRB industry's vulnerability. The Commission's conclusions, in this regard, were supported by substantial evidence and in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B)(i); see also NTN Bearing, 24 CIT at 389-90, 104 F. Supp. 2d at 115-16 (detailing the Court's standard of review for agency determinations).  Although the Court agrees with Timken that it is anomalous for the Commission to rely on Japanese pricing data covering a small fraction of Japanese imports, Timken has not convinced the Court that such data was indeed unrepresentative. See Kern-Liebers USA, Inc. v. United States, 19 CIT 87, 114-15 (1995) (stating that plaintiff failed to demonstrate that pricing

data collected by the Commission was unrepresentative, even if based on a relatively small sample size). However, the Commission's findings must consider all relevant economic factors "within the context of the business cycle and the conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1675a(a)(4) (emphasis added). The purpose of the business cycle requirement is to allow the Commission to consider whether different trends in the business cycle mask harm caused by unfair trading practices. See S. Rep. No. 100-71, 100th Cong., 1st Sess. 115-30 (1987); Chr. Bjelland Seafoods A/S v. United States, 16 CIT 945, 955-56 (1992) (citations omitted).

The ITC argues that Timken is precluded from raising the business cycle issue pursuant to the doctrine of exhaustion of administrative remedies. See ITC's Mem. at 59 n.52. The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court. See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action"). There is, however, no absolute requirement of exhaustion

in the Court of International Trade in non-classification cases. See Alhambra Foundry Co. v. United States, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998). Therefore, because of "judicial discretion in not requiring litigants to exhaust administrative remedies," the Court is authorized to determine proper exceptions to the doctrine of exhaustion. Alhambra Foundry, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986), rev'd in part on other grounds, Koyo Seiko Co. v. United States, 20 F.3d 1156 (Fed. Cir. 1994)).

The Court exercises its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) (in those cases when "it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which

plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken, 10 CIT at 93, 630 F. Supp. at 1334; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question, see id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) the plaintiff had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. See Philipp Bros., Inc. v. United States, 10 CIT 76, 79-80, 630 F. Supp. 1317, 1321 (1986).

During the sunset review, the Commission requested information concerning the business cycle. See Reply Br. Supp. Timken's Mot. J. Agency R. at 82; Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 64 Fed. Reg. at 15,786. It is obvious, then, that the Commission was on notice of the business cycle requirement and Timken had no reason to suspect that the Commission would disregard its statutory mandate. See 19 U.S.C. § 1675a(a)(4); see also Philipp Bros., 10 CIT at 79-80, 630 F. Supp. at 1321. The purpose

behind the doctrine of exhaustion is to prevent courts from premature involvement in administrative proceedings, and to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967); see also Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984) (pointing out that the "exhaustion doctrine . . . serv[es] four primary purposes: [(1)] it ensures that persons do not flout [legally] established administrative processes . . . ; [(2)] it protects the autonomy of agency decision-making; [(3)] it aids judicial review by permitting factual development [of issues relevant to the dispute]; and [(4)] it serves judicial economy by avoiding [repetitious] administrative and judicial fact-finding . . ." and by resolving sole claims without judicial intervention. (Citation omitted)). Therefore, the Court holds that not only did Timken sufficiently preserve the issue for consideration by this Court, but that the exhaustion doctrine is inapplicable to the question of whether the Commission should have considered relevant factors in the context of the business cycle. Accordingly, the Court remands the ITC's Final Determination for further explanation of the Commission's findings in the context of the appropriate business cycle.

The Court has considered additional arguments raised by Timken regarding other volume, price and impact on subject import findings arrived at by the Commission, and finds that they are without merit.

## CONCLUSION

The Court remands the <u>Final Determination</u> to the ITC to: (a) explain the likely impact of TRB imports from Japan on the entire United States TRB industry; (b) further investigate and explain the basis that Japanese TRB producers used to report their capacity to produce TRBs to the Commission; and (c) further explain the Commission's findings in the context of the TRB business cycle.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    April 24, 2003
          New York, New York