**Slip Op. 04-17**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

| | | |
|---|---|---|
| THE TIMKEN COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | Court No. 00-08-00386 |
| NSK LTD. and NSK CORPORATION; NTN BEARING CORPORATION OF AMERICA, NTN BOWER CORPORATION, AMERICAN NTN BEARING MANUFACTURING CORPORATION and NTN CORPORATION; KOYO SEIKO CO., LTD. and KOYO CORPORATION OF U.S.A., | : | |
| Defendant-Intervenors. | : | |

[The United States International Trade Commission's Remand Determination is affirmed. Case dismissed.]

Stewart and Stewart (Terence P. Stewart and William A. Fennell) for The Timken Company, plaintiff.

Lyn M. Schlitt, General Counsel, Office of the General Counsel, United States International Trade Commission (Mary Jane Alves and Andrea C. Casson) for the United States, defendant.

Crowell & Moring LLP (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for NSK Ltd. and NSK Corporation, defendant-intervenors.

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano and David G. Forgue) for NTN Bearing Corporation of America, NTN Bower Corporation, American NTN Bearing Manufacturing Corporation and NTN Corporation, defendant-intervenors.

Sidley Austin Brown & Wood LLP (Neil R. Ellis and Neil C. Pratt) for Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., defendant-intervenors.

                                        Dated:    February 25, 2004


**OPINION**

**I.   Standard of Review**

The Court will uphold the United StatesInternational Trade Commission's ("ITC" or "Commission") redetermination pursuant to the Court's remand unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accpet as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the [same] evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).


**II.  Background**

On April 24, 2003, this Court issued an order directing the Commission to

(a) explain the likely impact of TRB imports from Japan on the entire United States TRB industry; (b) further investigate and explain the basis that Japanese TRB producers used to report their capacity to produce TRBs to the Commission; and (c) further explain the Commission's findings in the context of the TRB business cycle.

Timken Co. v. United States, 27 CIT __, __, 264 F. Supp. 2d 1264, 1285 (2003).  On July 23, 2003, the ITC submitted its Remand Determination.  On August 22, 2003, NSK Ltd. and NSK Corporation (collectively, "NSK") filed comments with this Court in support of the ITC's remand determination.  On September 2, 2003, The Timken Company ("Timken") filed comments regarding the Remand Determination.  Subsequently, on September 8, 2003, NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Bower Corporation (collectively, "NTN"), Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively, "Koyo"), and NSK filed their respective comments to Timken's comments on the Remand Determination.  The ITC filed a response to Timken's comments on September 15, 2003.

## DISCUSSION

I.   **The ITC's Findings Regarding Reported Capacity Information**

   A.   **Contentions of the Parties**

      1.   **Timken's Contentions**

Timken complains that the Commission erroneously determined that Japanese producers lacked the capacity to increase exports to

the United States. See Timken's Comments Remand Determination ("Timken's Comments") at 1-7. Timken asserts that the ITC "has continued to base its volume holding on its finding that the Japanese producers 'were operating at extremely high capacity utilization (95.5 percent in 1998).'" Id. at 2 (quoting Remand Determination at 6). Timken maintains that the Commission wrongly relied "solely on the capacity figures reported by the Japanese producers for its volume determination." Id. at 5. Timken asserts that the capacity utilization data reported by the Japanese producers is not accurate. See id. at 3-5 (citing proprietary material). Moreover, Timken takes issue with the definition of capacity that the ITC used to determine capacity utilization rates. See id. at 4-5. Consequently, Timken deduces that the ITC failed to measure actual capacity. See id. (citing proprietary material). Timken also argues that the data the ITC relied upon is different from the data provided by Timken from World Bearing Statistics. See id. at 6. Finally, Timken complains that the methodology used by the Commission led to an inaccurate volume determination. See id. at 6-7 (citing proprietary material).

### 2. ITC's Contentions

The Commission responds that it complied with the remand instructions and reopened the agency record to investigate the basis on which the Japanese tapered roller bearing ("TRB")

producers used to report their capacity to produce TRBs. Rebuttal Comments of Def. ITC Regarding July 23, 2003, Five-Year Review Remand Determination Concerning TRBs Japan ("ITC's Comments") at 2-15. The Commission asserts that "Timken's arguments have now morphed into a disagreement about how the questionnaire responses were tabulated and about the conclusions the Commission drew from them." Id. at 4. The ITC refutes Timken's suggestion that there is "mathematical error" in its computations "because the quantities in the worksheets match the quantities reported in the questionnaire responses, the addition in the worksheets is verifiable by a hand calculator, and the results in the worksheets match the information reported in the summary table and in turn cited in the Commission's determinations." Id. at 5. In addition, the ITC asserts that it applied its established methodology to determine capacity utilization for foreign producers and the domestic industry. See id.

The Commission further asserts that it complied with the statutory requirements set forth in 19 U.S.C. § 1675a(a)(2)(A) by recognizing that, "during the period of review the Japanese industry as a whole operated at high capacity utilization rates that exceeded 100 percent . . . ." Id. at 6. The Commission maintains that it considered the likelihood of increased production or existing unused production capacity in Japan. See id. The ITC

further asserts that the Japanese producers provided additional information, which was reconfirmed and recertified during the remand proceedings, regarding the data previously reported in the five-year review. See id. at 7-8. The ITC states that: "the fact that individual Japanese producers may have been able to produce at levels greater (or lower) than their reported average production capacity such that their capacity utilization levels were greater (or lower) than one hundred percent does not detract from the reliability of the reported capacity information." Id. at 8. The ITC maintains that it "explicitly referenced and distinguished information reported in specific questionnaire responses and observed that 'in general' the average production capacity and production information reported by Japanese producers" was based on certain operating parameters. Id. at 6 (quoting proprietary material).

### 3. NSK, Koyo, and NTN's Contentions

NSK, Koyo and NTN generally agree with the ITC's finding that Japanese producers had high capacity utilization rates during the period of review ("POR"). NSK's Comments Supp. ITC's Remand Determination (NSK's Comments") at 1-3; Rebuttal Comments Def.-Int. Koyo Timken's Comments Remand Determination ITC ("Koyo's Comments") at 2-6; NTN's Rebuttal Comments Remand Determination ("NTN's Comments") at 2-6. NSK points out that during the sunset review,

the Commission "calculated an 'actual' capacity figure . . . while the [World Bearing Statistics] calculated a 'theoretical' capacity figure." NSK's Comments at 2-3. Consequently, NSK maintains that the "two databases should not be confused [or compared] with one another." Id. at 3.

Koyo maintains that the definition of production capacity proposed by Timken "is not based on the normal measure of capacity used in the industry, but rather an ill-defined notion of maximum theoretical capacity." Koyo's Comments at 3. The Commission sought a realistic estimate of production capacity under normal operating conditions and not a theoretical measure. See id. at 4. Consequently, Koyo argues that "Timken's reliance on a theoretical notion of maximum production capacity is not a sufficient basis for this Court to reject the Commission's reliance on the capacity utilization figures reported by the Japanese respondents . . . ." Id.

Koyo further points out that Timken's argument regarding the use of data collected by the Japan Bearing Industrial Association ("JBIA") "ignores the numerous differences and shortcomings of the JBIA data, which were spelled out by the Japanese respondents and the Commission during this remand proceeding." Id. at 5. According to Koyo, "Timken's argument is really nothing more than a complaint about the manner in which the Commission weighed the

evidence Timken submitted against the capacity utilization data submitted by the Japanese respondents." Id. at 6.

NTN adds that "Timken's ability to show that there was data on the record different from the data relied upon by the ITC is insufficient to overturn the ITC's decision." NTN's Comments at 2. NTN asserts that the ITC reasonably concluded that its "own certified, verifiable questionnaire responses were more likely to reflect accurate data than were the JBIA's reported figures." Id. at 4. NTN maintains that it is within the Commission's discretion to make decisions regarding the evidence before it and that "the ITC made a reasoned decision based on that substantial record evidence to accept the capacity utilization data reported by the Japanese producers in their ITC questionnaire responses." Id. at 6.

### B.   Analysis

The Court found that, during its sunset review, "the Commission erred by not inquiring into the basis used by Japanese TRB producers to report their capacity." Timken, 27 CIT at ___, 264 F. Supp. 2d at 1280. The Commission issued remand questionnaires to Japanese TRB producers requesting such producers to "(1) review the average production capacity and production information . . . and to report the number of shifts per day, the number of days per week, and the number of weeks per year that were

the basis for that information for the reported periods; [and] (2) identify and quantify any idled equipment that was available to produce TRBs in their Japanese facilities [for the POR]." Remand Determination at 3-4. Based on the information collected from the remand questionnaires, the ITC found "that Japanese producers had extremely high capacity utilization rates during the period examined in the five-year review." Id. at 4. The Court does not agree with Timken that the Commission's volume determination is unsupported by substantial evidence.

Timken argues that the definition of average production capacity used by the ITC does not take into account any idle equipment or the number of shifts used to determine production capacity. See Timken's Comments at 4-5. Accordingly, Timken asserts that the faulty definition prevented the ITC from accurately measuring the average production capacity for Japanese producers. See id. Timken essentially requests the Court to substitute the Commission's understanding of capacity utilization rates for Timken's notion of such rates. In light of the record evidence, the Court holds that the ITC was reasonable in determining "that Japanese producers had extremely high capacity utilization rates during the period examined in the five-year review." Remand Determination at 4. As the Court has previously stated, "the question of whether the ITC conduc[ted] a thorough .

. . investigation begins with the substantial evidence test, and the question of whether, in light of the record evidence as a whole, 'it would have been possible . . .'" for the Commission to have reasonably reached its final determination. Acciai Speciali Terni S.p.A. v. United States, 24 CIT 1064, 1074, 118 F. Supp. 2d 1298, 1307 (2000) (quoting Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366-67 (1998)). In the case at bar, the Commission gathered necessary information that considered whether equipment remained idle and the number of shifts reported by the Japanese producers. Moreover, Timken did not produce any evidence to prove such information unreliable.

Timken contends that the Commission's measure of capacity is unsupported by the evidence because the basis for such measurement was the capacity data reported by the Japanese producers. Timken's Comments at 3-4. The Commission asked the Japanese producers to report:

> The level of production that [they] could reasonably have expected to attain during the specified period. Assume normal operating conditions (i.e., using equipment and machinery in place and ready to operate; normal operating levels (hours per week/weeks per year) and time for downtime, maintenance, repair, and cleanup; and a typical or representative product mix).

Remand Determination at 3. Timken argues that it has presented certain record evidence which demonstrates that this definition does not accurately reflect the production capacity of Japanese

producers.  See Timken's Comments at 4-5.  The Court, however, does not agree with Timken.  The Court will not overturn the ITC's determination "merely because the plaintiff 'is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination.'" Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990) (internal citations omitted), aff'd, 938 F.2d 1276 (Fed. Cir. 1991).  The Commission reasonably relied on the information submitted by Japanese producers as well as their reconciliation of such information with secondary information submitted by Timken. The ITC recognized that Japanese producers' capacity utilization rates ranged from 95.5 to 104.2 percent.  Remand Determination at 2.  Furthermore, the ITC took into account the reported information prior to making its determination.  Accordingly, the Court will not substitute the Commission's determination based on record data with Timken's interpretation of such data.

The Court finds that the ITC reasonably determined that the information received from the remand questionnaires was "the most probative and reliable data."  Id. at 5.  The Commission did not take the Japanese producers' responses at face value, but rather it "required questionnaire respondents to certify the accuracy of

their reported information."[1]  <u>Id.</u>  The ITC reasonably deduced that the data submitted by Japanese respondents is more probative because "the data submitted to the JBIA carry no certification obligation, are not subject to verification or review by independent entities, may be revised and adjusted, and are not subject to the same rigors as information used in investigations such as the Commission's."  <u>Id.</u> at 6.  The Commission determines how to gather information and Timken has the burden of demonstrating that the ITC's methodology is contrary to law. <u>Torrington</u>, 14 CIT at 514, 745 F. Supp. at 723.  Here, Timken has failed to meet this burden.  Accordingly, the Court holds that the ITC adequately investigated and explained the basis that Japanese producers used to report their capacity to produce TRBs.

## II.  The ITC's Likely Volume Determination with Respect to the Domestic Industry as a Whole

### A.    Contentions of the Parties

#### 1.    Timken's Contentions

Timken complains that the Commission erroneously concluded that Japanese producers would not compete for the United States market share because it would harm their United States affiliates. <u>See</u> Timken's Comments at 15-21.  Timken asserts that the ITC,

---

[1]    It should be further noted that the responses were subject to verification by the ITC and by people with access to the data under a protective order.  <u>See</u> <u>Remand Determination</u> at 5.

conscious of this Court's instructions, "chose on remand to characterize its original finding that relationships with [United States] affiliates would limit the volume of subject imports from Japan as 'an additional factor' that would limit imports." Id. at 16. Timken argues that the ITC minimized its previous finding regarding the effect Japanese affiliates in the United States would have on imports. See id. Timken maintains, however, that record evidence indicates that each Japanese producer would be able to compete for sales without affecting their United States affiliates' sales. See id. at 17. Timken states that it submitted affidavits from its sales associates showing that it often competes with the Japanese TRB producers for certain accounts. See id. at 18. Timken deduces that "a Japanese producer selling a [United States]-made part to a customer that sources other part numbers from Timken can import those other part numbers to compete with Timken without interfering with its sales of [United States]-made products."[2] Id. Finally, Timken complains that "the testimony of counsel for a Japanese producer, the history of this finding and order, the testimony of Timken's salesmen, and the opinions of two

---

[2]     Timken seems to argue that the ITC should not revoke the antidumping duty order because its profits margin may be harmed by increased competition. The purpose of the antidumping duty statute, however, is to protect United States industries not specific corporations from unfair behavior by foreign competitors. In the instant case, Japanese companies have established United States affiliates to compete with United States corporations.

Commissioners all support the proposition that Japanese producers could increase imports without affecting their [United States] production facilities." Id. at 20.

## 2.   ITC's Contentions

The Commission responds that its analysis of the likely subject import volume is consistent with the statutory requirements of 19 U.S.C. § 1675a(a)(2). See ITC's Comments at 10. The ITC maintains that its likely subject import volume determination is premised on several factors: (a) "the declining volume of subject imports from Japan both absolutely and relative to production and consumption in the United States since the imposition of the 1987 antidumping order;" (b) increased investment in United States production facilities by Japanese producers; (c) the high capacity utilization rates of Japanese producers; (d) "Japanese producers' orientation toward home and third-country markets and the absence of import barriers to Japanese TRB shipments to third countries; [(e)] low Japanese inventory to shipment ratios"; and (f) the expense and difficulty of product shifting. Id. at 11. Consequently, the ITC states that its analysis, contrary to Timken's assertions, "was not limited to its findings concerning Japanese producers' capacity and capacity utilization levels." Id. The ITC asserts that Timken "misrepresents the weight accorded Japanese producers' capacity and capacity utilization information

in both the original review determination and the remand determination." Id. at 9.

Furthermore, the Commission argues that it properly considered the entire domestic industry in concluding that the volume of subject imports would likely be small and "would not be likely to suppress or depress domestic prices to a significant degree, and was not likely to cause material injury to the domestic industry as a whole . . . ." Id. at 15. The Commission takes issue with Timken's assertion that the volume of subject imports from Japan could increase and affect the United States market without competing with the products made by the Japanese producers' domestic affiliates. The ITC maintains that this argument is flawed because it relies on the assumption that likely volume of subject imports from Japan would be significant upon revocation of the order. See id. at 13. The Commission asserts that the record evidence supports the opposite conclusion. See id. Japanese producers' extremely high capacity utilization levels and their significant commitments to customers in their home and third country markets support the ITC's finding that the likely volume of subject imports from Japan was not likely to be significant. See id. at 13-14. The Commission found that "even if all available Japanese production capacity were used to produce TRBs for the [United States] market," such capacity level was small. Id. at 13.

### 3.   NSK, Koyo, and NTN's Contentions

NSK, Koyo and NTN agree that the ITC properly found that imports of the subject merchandise were not likely to be significant if the order is revoked.  See NSK's Comments Opp'n Timken's Comments Remand Determination ("NSK's Opp'n Comments") at 8-9; Koyo's Comments 9-11; NTN's Comments 9-11.  NSK asserts that the ITC correctly found that the relationship between Japanese producers and their United States affiliates is a factor "that would likely limit the volume of subject imports from Japan as regards sales by the [United States] affiliates."  NSK's Opp'n Comments at 8.  Defendant-intervenors maintain that the Commission reviewed other record evidence from which it concluded that volume of subject imports from Japan would not be significant.  See id. at 8-9; Koyo's Comments at 9; NTN's Comments 9-10.  Koyo states: "the evidence on the record shows that, not only did the Japanese producers [lack] the ability to substantially increase TRB production in Japan for shipment to the United States, but they also could not have easily shifted shipments to the United States sales from other markets."  Koyo's Comments at 10.

### B.   Analysis

Section 1675a(a)(4) (1994) of Title 19 of the United States Code states that "in evaluating the likely impact of imports of the subject merchandise on the industry if the order is revoked . . .

the Commission shall consider all relevant economic factors which are likely to have a bearing on the state of the industry in the United States . . . ." The Court found that the ITC did not "adequately explain why an increase in Japanese imports of the subject merchandise would not injure the remaining United States industry; that is, TRB producers other than those owned by Japanese companies." Timken, 27 CIT at ___, 264 F. Supp. 2d at 1278. The Court, however, finds that on remand the Commission adequately explains the impact an increase in volume of the subject imports would have on the entire United States domestic industry.

The Commission reasonably determined that the domestic industry would not be injured even if all available Japanese production capacity were used to produce TRBs for the United States market. See Remand Determination at 6. The ITC's determination is based on record evidence indicating what percentage of total apparent United States consumption (by quantity) in 1998 a high Japanese production level would constitute. The ITC further explains that, based on the projected moderate growth of the TRB industry, "any possible increase in subject import volume that might occur within the reasonably foreseeable future likely would come out of an increased demand in the market, not at the expense of the domestic industry." Id. at 6-7.

The ITC based this determination on a number of factors, including the relationship between the Japanese producers and their United States affiliates.  The Court does not agree with Timken that the Commission re-characterized its original finding regarding the significance of the relationship between the Japanese producers and their United States affiliates.  "It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence."  NMB  Sing. Ltd. v. United States, 27 CIT ___, ___, 288 F. Supp. 2d 1306, 1334 (2003) (quoting Maine Potato Council v. United States, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985)).  Here, the ITC clarified that the relationship between the Japanese producers and their United States affiliates is an additional factor that would likely limit the volume of subject imports from Japan in the reasonably foreseeable future.  The Court finds that the ITC properly applied its discretion in weighing the record evidence regarding the relationship between the Japanese producers and their United States affiliates.  The Court also finds that the Remand Determination provides sufficient explanation as to why an increase in imports from Japan would not injure the United States domestic industry.

**III. The Commission's Determination Regarding the TRB Industry's Business Cycle**

    **A.    Contentions of the Parties**

        **1.    Timken's Contentions**

Timken complains that the Commission erroneously concluded that the TRB industry has no significant business cycle. See Timken's Comments at 7-15. Timken asserts that the record included evidence demonstrating that the TRB industry had peaked and was poised for a downturn. See id. at 8. Furthermore, Timken states that "[b]ecause the Commission had already observed an industry business cycle based on apparent consumption in the [United States] TRB industry during the original investigation, the existence of a TRB business cycle was an established fact already on the record." Id. at 9-10 (citing Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, The People's Republic of China, and Romania ("1987 Review"), Inv. Nos. 731-TA-341, 344, and 345 (Final), USITC Pub. 1983, List 1, PD 978, at A-24 (June 1987)). Timken asserts that it supplemented consumption data collected by the Commission showing that the industry was experiencing peak demand during the POR, with information about its own business and TRB customers. See Timken's Comments at 10.

Timken contends that the information it submitted showed that its TRB business devoted to a specific type of customer had peaked and was likely to be on a downward cycle if the order were revoked. See id. (citing proprietary material). Timken asserts that it "tracked its own return on investment for a 20-year period which showed clear peaks in 1987-88 and 1996-97." Id. In addition, Timken states that it submitted information indicating the reduced demand already experienced by TRB customers in farm machinery, mining machinery, power transmission, and steel products. See id. at 11. Timken maintains that it responded to the declines in demand for TRBs by limiting inventories and capital spending and reducing employment levels. See id. at 12.

Timken complains that the Commission's treatment of the data is not consistent with its treatment of similar information in a different review. See id. (citing Gray Portland Cement and Cement Clinker from Japan, Mexico, and Venezuela, Inv. Nos. 303-TA-21 (Review) and 731-TA-451, 461, and 519 (Review), USITC Pub. 3361 at 40-41 (Oct. 2000)). Timken points out that the ITC "specifically considered the fact that the demand cycle in that sunset review had peaked with slower or no growth expected in the reasonably foreseeable future." Timken's Comments at 12. Timken asserts that "[l]ike the cement industry, the Commission found the TRB industry to be capital intensive with 'high fixed costs' requiring high

capacity utilization rates to maximize return on investment." Id. at 13. In the case at bar, however, Timken complains that the ITC "did not consider the current condition of the industry in the context of its business cycle as was done in Cement." Id. Timken also takes issue with the Commission's approach of grouping together all sizes and number of rows of TRBs to determine capacity utilization. See id. Timken argues that in relying "only on capacity utilization figures based on quantity [the ITC] did not take into account the effect of the downturn among industrial customers for bearings." Id. at 15.

### 2. ITC's Contentions

The Commission responds that it properly considered the relevant economic factors within the context of the business cycle and conditions of competition that are distinctive to the domestic TRB industry. ITC's Comments at 15-20. The ITC asserts that it repeatedly requested information relevant to the domestic industry regarding the business cycle and conditions of competition during the five-year review. See id. at 16. According to the Commission, these "requests did not yield much information evidencing a well-defined business cycle, let alone information pertinent to the domestic industry as a whole, or where the industry as a whole would be positioned with respect to a business cycle in the reasonably foreseeable future." Remand Determination at 9. The

ITC states that Timken repeats the arguments it previously made before the agency, such as its argument that the ITC should be bound by its findings in the original investigation. See ITC's Comments at 17-18. The ITC responds that this Court has found that the ITC must consider its prior injury determination, but that these findings are not dispositive. See id. at 18 (citing Timken, 264 F. Supp. 2d at 1274).

In addition, the ITC argues that, "contrary to Timken's assertion, the Commission never found the existence of a business cycle in any of the underlying original investigations to this five-year review." Id. (emphasis in original). The Commission points out that "the cite provided by Timken . . . is to a sentence in a staff report that was never explicitly adopted in an opinion of the Commission." Id. at n.66. The ITC also asserts that its proceedings are sui generis and that in the review at issue it "found that there was not much information in these proceedings evidencing a well-defined business cycle in [the TRB] industry, let alone information pertinent to the domestic industry as a whole, or where the industry as a whole would be positioned with respect to a business cycle in the reasonably foreseeable future." Id. at 18. The Commission maintains that its analysis was based on the lack of a distinctive business cycle in the TRB industry:

> [I]ts conclusion that the domestic industry is not in a vulnerable state, that the TRB market is expanding,

apparent domestic consumption is increasing, the domestic industry is highly concentrated and profitable, and the domestic industry's market share has increased to the level held during the original 1987 investigation as capacity and capacity utilization increased substantially, as well as its conclusions concerning the absence of significant likely volume and price effects.

Id. at 19. Finally, the ITC argues that "Timken simply has not shouldered its burden under 28 U.S.C. § 2639(a)(1) to demonstrate why the Commission's remand determination is not supported by substantial evidence or otherwise in accordance with law." Id. at 20.

### 3. NSK, Koyo, and NTN's Contentions

Defendant-intervenors agree that the Commission properly concluded that the TRB domestic industry does not have an independent business cycle, but rather relies on the business cycles of its end-use customers. See NSK's Opp'n Comments at 6-8; Koyo's Comments at 6-8; NTN's Comments at 6-8. Koyo asserts that, "[i]ndeed, Timken itself has acknowledged the fact that demand for TRBs is derived from the business cycles of the downstream industries." Koyo's Comments at 7. NSK contends that "substantial facts thus support the Commission's decision that, whereas various TRB purchasers operate subject to their own distinctive business cycles, TRB producers just respond to purchasers' demands, and consequently do not experience a business cycle of their own." NSK's Opp'n Comments at 7. Koyo adds that the ITC's analysis sufficiently addresses its statutory responsibility to consider

economic factors "within the context of the business cycle." See Koyo's Comments at 7.  Koyo also states that while Timken may not agree with the ITC's conclusions regarding the impact that the business cycles of the end-user industries has on the business cycle of the TRB industry, such disagreement solely concerns the weighing of evidence which is not an issue for this Court to decide. See id. at 7-8.

Koyo asserts that the Commission correctly veered from its decision in a previous sunset review regarding a different industry because the ITC's determination is fact intensive.  See id. at 8. NTN adds that the previous review and the review at issue are not similar because in the former case the ITC found the business cycle to be tied to seasonal demands in consumption whereas, in the TRB industry, the ITC determined that the business cycle is tied to demand by a variety of industries and customers.  See NTN's Comments at 8.  Koyo asserts that the ITC's decision in one sunset review regarding the economic significance of the business cycle is of limited value in a sunset review involving a different industry. See Koyo's Comments at 8.

### B.  Analysis

The Court is satisfied with the Commission's explanation in the Remand Determination of its consideration of relevant economic factors in the context of the business cycle and the conditions of

competition that are distinctive to the United States TRB industry.
The Commission explains that its requests for information regarding
the domestic business cycle "did not yield much information
evidencing a well-defined business cycle, let alone information
pertinent to the domestic industry as a whole, or where the
industry as a whole would be positioned with respect to a business
cycle in the reasonably foreseeable future."  Remand Determination
at 9.   The Court finds that the ITC reasonably found that the
record in the review at issue does not indicate a specific business
cycle for the United States TRB industry.

The ITC also reasonably concluded that demand for TRBs is
"derived and driven by the demand for end-use products." Id. at 10.
The Commission states that "[g]iven the wide variety of customers
and the multitude of distinct industries for which TRBs are used,
we do not find this industry to be characterized by a regular and
measurable business cycle that might be characteristic of other
industries."  Id.  Section 1675a(a)(4) of Title 19 of the United
States Code directs the Commission to analyze "all relevant
economic factors described in this paragraph within the context of
the business cycle . . . ."  In the original investigation, the TRB
industry's business cycle was dependent on the business cycles of

end-users.[3]  See 1987 Review, Pub. 1983, List 1, PD 978, at A-24.

Here, however, the ITC has sufficiently explained that it could not

find a discernable business cycle for the domestic TRB industry.

The Commission explains that

> the diversity of customers and industries for which TRBs
> are used, as well as the small share of the cost of the
> finished products for which TRBs are used, limits the
> effect that downturns in demand from particular customers
> or user industries, particularly to the extent that at
> any given time, TRB end user industries are likely at
> different positions in their business cycles than other
> TRB end user industries.

Remand Determination at 11.  Based on its findings regarding the

diverse customer base and limited effect of downturns in demand,

the Commission reasonably concluded that the TRB industry does not

experience discernable "recurrent expansion and contraction of

economic activity."  BLACK'S LAW DICTIONARY 192 (7th ed. 1999)

(defining "business cycle") (emphasis added).  Accordingly, the

Commission's explanation of relevant factors in the context of the

appropriate business cycle for TRBs is reasonable and supported by

record evidence.

---

[3]    The Court notes that the Commission correctly asserts
that it did not find the existence of a business cycle in any of
its previous reviews concerning TRBs.  See ITC's Comments at 18.
Rather, the conclusions regarding the TRB industry's business cycle
was contained in a staff report.  See 1987 Review, Pub. 1983, List
1, PD 978, at A-24.  The staff report states that "[t]here is very
little seasonality with regard to [United States] consumption of
[TRBs], primarily because the broad industrial base of the market
allows for independent industry consumption trends to offset each
other.  There appears to be about a 4- to 6- year business cycle to
the [TRB] industry . . . ."  Id.

The Court does not agree with Timken's assertion that the Commission should follow its findings from an investigation concerning different products altogether. See Timken's Comments at 12-13. The Commission must take into consideration the many economic variables unique to each review. Accordingly, there is limited precedential value to previous reviews because the Commission is not required to make identical determinations in each. Instead, the Commission must independently consider each subject import and the circumstances of each investigation as sui generis. See Timken Co. v. United States, 2004 Ct. Intl. Trade LEXIS 7 *54-55 (2004); Armstrong Bros. Tool Co. v. United States, 84 Cust. Ct. 102, 115, 489 F. Supp. 269, 279, C.D. 4848 (1980); see also Citrusco Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1087 (1988). The ITC acted properly in disregarding its findings from a review concerning different subject imports and a different industry altogether. Accordingly, the Court finds that the Commission sufficiently explained its findings in the context of the appropriate business cycle as mandated in Timken, 27 CIT at ___, 264 F. Supp. 2d at 1285.

## CONCLUSION

The Court finds that the Commission sufficiently met its burden of (a) explaining the likely impact of TRB imports from

Japan on the entire United States TRB industry; (b) investigating and explaining the basis used by Japanese TRB producers to report their production capacity; and (c) explaining its findings in the context of the appropriate business cycle. Judgment will be entered accordingly.


/s/ Nicholas Tsoucalas
**NICHOLAS TSOUCALAS**
**SENIOR JUDGE**



Dated:     February 25, 2004
           New York, New York